IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| TESSA MYERS, | ) | Case No. 1:23-CV-00321 |
| | ) | |
| Plaintiff, | ) | JUDGE CHRISTOPHER A. BOYKO |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff, Tessa Myers, seeks judicial review of the final decision of the Commissioner of

Social Security, which denied her applications for disability insurance benefits ("DIB") and

supplemental security income ("SSI") under Titles II and XVI of the Social Security Act.  Myers

challenges the Administrative Law Judge's ("ALJ") negative findings, contending that the ALJ

erred in evaluating her subjective symptom complaints by failing to adequately explain her

reasoning.  Because the ALJ failed to apply proper legal standards in how she expressed her

finding that Myers's subjective symptoms complaints concerning of her physical impairments

were inconsistent with the record evidence, I recommend that the Commissioner's final decision

denying Myers's applications for DIB and SSI be vacated and that Myers's case be remanded for

further consideration.

I.      **Procedural History**

Myers applied for DIB and SSI on October 9, 2020.  (Tr. 244-256).  Myers alleged that

she became disabled on July 8, 2020, due to (i) dyslexia, (ii) lupus, (iii) attention-deficit

hyperactivity disorder ("ADHD"), (iv) depression, (v) back pain, (vi) anxiety, (vii) "breathing

problems," (viii) asthma, and (ix) osteoporosis.  (Tr. 290, 294).  The Social Security

Administration denied her applications initially and upon reconsideration.  (Tr. 76-85, 98-108).

Myers requested an administrative hearing.  (Tr. 151-152).

ALJ Pamela Loesel heard Myers's case telephonically on January 27, 2022 and denied

her applications in a March 2, 2022 decision.  (Tr. 24-39, 45-75).  In doing so, the ALJ

determined that Myers had the residual functional capacity ("RFC") to perform light work,

except that:

> [Myers could] frequently climb ramps and stairs; occasionally climb ladders, ropes
> or scaffolds; occasionally stoop; frequently kneel, crouch and crawl; avoid
> concentrated exposure to fumes, odors, dusts, gases and poor ventilation; avoid
> concentrated exposure to hazards; can perform simple routine tasks (consistent with
> unskilled work) with no fast pace or height production quotas; no direct work with
> the general public; and perform work with infrequent changes where changes are
> explained in advance and gradually implemented.

(Tr. 32).  The Appeals Council declined Myers's request for review, rendering the ALJ's

decision the final decision of the Commissioner.  (Tr. 1-4).  Myers filed a complaint seeking

judicial review.  ECF Doc. 1.[1]

## II.    Evidence

### A.    Personal, Educational, and Vocational Evidence

Myers was born on May 26, 1992 and was 28 years old on the alleged onset date.

(Tr. 290).  Myers's disability report indicated that: she had completed the 10th grade but was

learning disabled; and she had prior work as: a cashier, in food preparation at a fast-food

restaurant, a game room attendant, and a machine operator.  (Tr. 295-296).

---

[1] This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b).

### B.    Relevant Medical Evidence

#### 1.    Pre-onset date

Because the ALJ considered evidence generated before Myers's alleged onset date, I include a brief description Myers's medical record from that period.

On July 31, 2019, Myers established care with Van Warren, M.D., concerning pain in her knees and left shoulder. (Tr. 731). Myers reported that she had been experiencing pain in her knees, hips, and shoulders for three years. *Id.* She noted also having vision problems, itchy eyes, decreased hearing, recurrent painful mouth sores, sun sensitivity with a facial rash and easy sunburning, scalp hair breakage, and morning stiffness. *Id.* She also indicated she had epigastric pain after eating, shortness of breath with exertion, and recurrent swelling in her feet in hot weather. *Id.* On examination, Dr. Warren noted that Myers had mild pain in the lateral aspect of her left shoulder with abduction to 90 degrees, mild tenderness in her knees, and that the "integument [was] remarkable for faint papular erythema in the malar aspect" of her face. *Id.* Dr. Warren's impression was that she had facial rash with sun exposure, arthralgia, a family history of lupus, and he was "suspicious for possible connective tissue disorder with sicca symptoms." *Id.* He ordered imaging and laboratory testing. *Id.*

On October 24, 2019, Myers had diagnostic imaging done on her knees, the results of which were unremarkable. (Tr. 675-676). The same day, Myers also underwent serology testing, which was positive under an ANA test and suggestive of systemic lupus erythematosus, scleroderma, or Sjogren's Syndrome/sicca complex. (Tr. 678-679).

On November 6, 2019, Myers saw Dr. Warren about pain in her elbows and shoulders. (Tr. 729). Based on her prior imaging and testing, Dr. Warren diagnosed Myers with systemic lupus erythematosus, sun sensitivity, rash, and recurrent mucosal ulcers. *Id.* He started her on

hydroxychloroquine.  *Id.*  He also diagnosed her with arthralgia of both knees, referred her to an ophthalmologist, and started her on calcium.  (Tr. 730).

On April 1, 2020, Myers saw Dr. Warren, regarding her lupus.  (Tr. 726).  Myers reported falling the week before and again the day prior, resulting in bruising on her right forearm and pain in her ankles, shoulders, and arms.  (Tr. 727).  Myers also reported red and white discoloration in her hands with cold exposure, bilateral tinnitus, and a bumpy rash on her anterior thighs.  *Id.*  Dr. Warren noted on examination that she had superficial abrasions on her right forearm, normal muscle strength in her extremities and neck flexors, a normal gait, and no signs of synovitis.  *Id.*  He instructed her to increase her hydroxychloroquine dosage.  *Id.*

### 2.      Post-onset date

On September 2, 2020, Myers saw Abdul-Ghani Orra, D.O., complaining of a persistent cough.  (Tr. 751-752).  Myers reported having had the cough for several days, indicating it was worse with humid weather, and that she'd had a panic attack, slight depression, and needed medication for concentration.  (Tr. 752).  A review of Myers's systems was unremarkable.  (Tr. 751-752).  Dr. Orra ordered a chest x-ray, and prescribed medication.  *Id.*

On October 9, 2020, Myers saw Dr. Orra, complaining of a severe cough and joint pain (Tr. 748-749). Her physical examination results were unremarkable.  *Id.*  Myers reported that her rheumatologist had taken her off hydroxychloroquine and that she'd been wearing knee, ankle, and thumb braces for two weeks.  (Tr. 749).  Dr. Orra prescribed her Cheratussin and Symbicort for her cough and ibuprofen for her joint pain.  *Id.*

On October 21, 2020, Myers started as a new patient with Laura Eiseman, APRN-CNP. (Tr. 1022-1025).  Myers reported that she was being treated by her rheumatologist for lupus, had a cough that she was prescribed steroids for, had previously taken Strattera for ADHD, had been diagnosed as a teenager with anxiety and depression but was not actively being treated, had

4

external hemorrhoids, and had swelling around her thyroid.  (Tr. 1022).  A review of Myers's

systems was consistent with her complaints.  *Id.*  Nurse practitioner Eiseman's observations on

physical examination were unremarkable.  (Tr. 1023).  Eiseman referred Myers for reevaluation

of her ADHD and started her on medication for allergic rhinitis, anxiety, constipation, and

hemorrhoids.  (Tr. 1023-1024).

On December 14, 2020, Myers underwent a gallbladder ultrasound.  (Tr. 826-827).  The

ultrasound identified two nonmobile echogenic foci along the gallbladder wall, which were noted

to be likely polyps.  (Tr. 845).  The same day, she went to the emergency room for nausea.

(Tr. 835).  She was noted to have positive symptoms for anorexia, nausea, and vomiting.

(Tr. 836).  Myers reported having pain in the right upper quadrant of her abdomen, noting it

worsened after eating beef.  (Tr. 839).  She reported feeling nauseated and vomiting after meals

for the preceding two weeks, having diarrhea, and rated her pain as 4/10.  *Id*.  A review of her

systems was consistent with her complaints, and her physical examination results were

unremarkable, save for mild right upper quadrant tenderness.  (Tr. 839-840).  Myers was given

pain and anti-nausea medication and instructed to follow up with her primary care physician and

surgeon, in light of the polyps.  (Tr. 840).

On December 16, 2020, Myers saw Nurse practitioner Eiseman for a follow-up

appointment regarding her anxiety and depression.  (Tr. 1018).  Myers reported feeling stable on

Prozac and waiting to be schedule with a psychologist.  *Id.*  Myers noted she had been in the ER

a few days prior and was found to have possible gallbladder polyps, and she was also

experiencing intermittent nausea.  *Id.*  A review of her systems was consistent with her

complaints, and Eiseman's observations on examination were unremarkable.  (Tr. 1018-1019).

Eiseman referred Myers to surgery for evaluation regarding her gallbladder, prescribed her anti-

nausea medication, and continued her other medication.  (Tr. 1020-1021).

On December 22, 2020, Myers saw doctors regarding the foci identified on her gallbladder.  (Tr. 877-880).  A review of Myers's systems was largely unremarkable, except some reported fatigue, weight gain over time, difficulty sleeping, and occasional cough with shortness of breath.  (Tr. 878, *see also* Tr. 1016).  Myers's physical examination results were also, largely unremarkable; it was noted that she had some "mild vague tenderness" in her epigastric and right upper quadrant of her abdomen.  (Tr. 879-880).  Her symptoms were noted to be consistent with biliary colic and a cholecystectomy was recommended.  (Tr. 877).

On December 23, 2020, Myers saw Dr. Warren for her lupus and complaints of discomfort in her hands and shoulders.  (Tr. 1005).  On examination, he noted a "faint erythematous macular rash" on the malar aspects of her face, and mild tenderness on her right upper abdomen.  *Id.*  He also noted that her symptoms were suggestive of a mild exacerbation of her lupus.  *Id.*  Myers was given an intramuscular injection, and Dr. Warren noted that they would consider Benlysta injections after she further recovered.  *Id.*

On January 13, 2021, Myers underwent the cholecystectomy, which she appeared to tolerate well.  (Tr. 901, 933).  She was diagnosed with biliary colic and discharged in stable condition.  (Tr. 944, 951).  On January 26, 2021, Myers had a follow-up appointment with Eiseman after her cholecystectomy.  (Tr. 1002).  Myers reported doing well and not having any complications following her surgery; it was noted that her biliary colic symptoms had resolved but there was evidence of gallstones.  *Id.*  Myers's physical examination results were unremarkable.  (Tr. 1004).

On February 11, 2021, Myers saw Eiseman for high blood sugar and a sinus infection.  (Tr. 997).  Myers reported her elevated glucose lab results occurred after she had been eating cookies, she felt mentally stable on her Prozac, and she was feeling good after her cholecystectomy.  *Id.*  As to her sinus issues, Myers reported having a sinus infection a couple of

6

times a month, and that for the preceding week she had felt head and sinus pressure, nasal

drainage, headaches, a sore throat, cough, and ear pressure.  *Id.*  A review of her systems was

consistent with her complaints.  *Id.*  On examination, Eiseman noted that Myers appeared ill and

tired, and palpation of her sinuses indicated tenderness.  (Tr. 999).  She prescribed antibiotics

and allergy medication and instructed Myers to use saline spray.  (Tr. 1000).

On February 24, 2021, Myers saw Dr. Warren, for a follow-up appointment regarding

pain in her elbows, knees, and back.  (Tr. 995).  Myers reported that she had not been having any

Raynaud's symptoms, mucosal ulcerations, or significant rashes, although she noted some

puffiness in her hands.  *Id.*  She reported that she could not tolerate hydroxychloroquine due to a

pruritic rash.  *Id.*  Dr. Warren noted that Myers had normal passive range of motion in the joints

of her extremities with mild tenderness in her wrists, knees, and right elbow, as well as mild

tenderness in her right flank without any induration or masses.  *Id.*  He also observed normal

range of motion in her lumbar spine.  *Id.*  Dr. Warren diagnosed systemic lupus erythematosus,

and right lower back pain, recommended that Myers do stretching exercises, and prescribed

additional medication.  *Id.*

On March 3, 2021, Myers saw Courtney McAvinew, APRN-CNP, complaining of sinus

and nasal problems.  (Tr. 991).  She reported that her issues had begun with thick nasal drainage

but developed into bleeding when she was on antibiotics, and she reported: facial pressure,

bilateral nasal obstruction, throat clearing, hoarseness, decreased taste and smell, periorbital

edema, and that Claritin medications did not help but antibiotics did.  (Tr. 991-992).  She

indicated she had 12 sinus infections per year that required antibiotic treatment.  (Tr. 992).  A

review of her systems was consistent with her complaints.  *Id.*  Myers's physical examination

results were unremarkable.  (Tr. 994).  McAvinew found that Myers's symptoms were consistent

with chronic rhinitis, inferior turbinate hypertrophy, and a nasal deviation to the left.  (Tr. 991).

She recommended that Myers start two types of nasal spray.  *Id.*

On May 19, 2021, Myers saw Dr. Warren, complaining of pain in her elbows and left hip.

(Tr. 1050).  Myers reported recurrent pimples on her extremities and posterior thorax, she also

had generalized itching, a lack of improvement from Claritin, and frequent use of the restroom

after meals.  *Id.*  On examination, Dr. Warren observed an erythematous papular rash on the

malar aspect of her face, and no joint effusions.  *Id.*  He continued her medication, started her on

additional medication for itching, and instructed her to try MiraLAX.  *Id.*

On July 27, 2021, Myers saw Eiseman regarding her sinusitis.  (Tr. 1061).  Myers

reported that she had a cough, sore throat, and runny nose, and indicated in the prior week, she

had a headache/sinus pressure, nasal congestions/postnasal drip, dry and moist cough, sputum,

ear pain/pressure, sore throat, shortness of breath when coughing, and had been drinking lots of

fluids.  *Id.*  A review of her systems was consistent with her complaints.  (Tr. 1061-1062).

Eiseman observed that Myers had a cough and appeared fatigued and prescribed medication.

(Tr. 1061, 1064).

On August 12, 2021, Myers saw Eiseman, reporting that her depression and anxiety were

stable on her current medication, her constipation issues were stable on MiraLAX, her lupus

continued to be treated by her rheumatologist, and an appointment was scheduled with an ear,

nose, and throat doctor for her chronic sinusitis.  (Tr. 1056-1057).  A review of her systems was

consistent with her complaints, and her physical examination results were unremarkable, save for

a moist cough.  (Tr. 1058, 1060).  Eiseman encouraged Myers to make various lifestyle changes

for her weight and continued her medications.  (Tr. 1057).

On August 25, 2021, Myers saw McAvinew, who noted that Myers's rhinitis symptoms

had returned over the preceding month; she had thicker drainage from her right middle meatus,

and prior imaging revealed a "near complete opacification of the right maxillary sinus." (Tr. 1081).  Myers reported having nasal drainage, nasal obstruction, and facial pressure, and noted that she had a sinus infection about four to five weeks prior.  *Id.*  On examination, McAvinew noted that Myers's nasal dorsum was midline, and she had a mild septum deviation to the left and hypertrophic inferior turbinates.  (Tr. 1084).  McAvinew recommended "maximum medical therapy" and CT imaging.  (Tr. 1081).

On October 6, 2021, Myers saw Dr. Warren, complaining of low back pain; he continued her medication.  (Tr. 1086).

On October 27, 2021, Myers saw Eiseman, complaining of a cough and chest congestion. (Tr. 1093-1094).  A review of her systems was positive for a headache/sinus pressure, nasal congestion/postnasal drip, a cough, sputum, ear pain/pressure, a sore throat, shortness of breath, mild loss of taste, back discomfort on her left side, and urinary frequency.  (Tr. 1095). Eiseman's observations on examination were unremarkable.  (Tr. 1098).  Eiseman assessed Myers with a urinary tract infection, for which she prescribed an antibiotic and lifestyle changes, and an upper respiratory infection, for which she also prescribed antibiotics and instructed Myers to have a CT scan of her sinus.  (Tr. 1094).

### C.  Opinion Evidence

#### 1.  Medical Statement Regarding Lupus – Van Warren, M.D.

On April 23, 2021, Dr. Warren completed a medical statement regarding Myers's lupus. (Tr. 1044-1046).  Dr. Warren did not indicate whether Myers was diagnosed with systemic lupus erythematosus, but indicated that she had a malar rash, photosensitivity, arthritis, and oral ulcers. (Tr. 1044).  He also noted that she was diagnosed with lupus through an ANA laboratory test. *Id.*  Dr. Warren indicated that Myers had joint pain, stiffness, and swelling; mouth sores; and Raynaud's phenomenon.  *Id.*  He noted that Myers retained the ability to ambulate effectively

9

and perform fine and gross movements.  (Tr. 1045).  Dr. Warren opined that Myers could stand

for 4 hours in an 8-hour workday, walk 2 hours in an 8-hour work day, and sit for 4 hours in an

8-hour work day.  *Id.*  He also concluded that Myers could occasionally lift less than 10 pounds

but could frequently lift 10 to 20 pounds.  (Tr. 1045-1046).  He further concluded that she could

occasionally bend, stoop, perform fine manipulation with her hands, and raise her arms over her

shoulders.  (Tr. 1046).  But Myers could only frequently perform gross manipulation with her

hands.  *Id.*  Dr. Warren assessed that Myers's impairments could cause her to be absent from

work more than three times a month.  *Id.*  He indicated that her limitations had applied

"[p]robably [since her] initial office visit [on] 7/31/2019."  *Id.*  He reported that "[Myers] has

been having complaints of pain involving the knees, shoulders, [unintelligible], and lower back.

She has intolerance to Hydroxychloroquine due to rash."  *Id.*

### 2.    Psychological Evaluation – Christopher Ward, Ph.D.

On June 22, 2020, Myers saw Christopher Ward, Ph.D., for a psychological evaluation.

(Tr. 735-740).  Myers explained that her chief complaints related to her conditions and her

family, educational, and medical history, noting lupus, shoulder pain, knee pain, osteoporosis,

skin discomfort, abdominal and intestinal discomfort, and balance issues.  (Tr. 736).  Myers

reported being on Adderall for ADHD, but she had stopped several years prior.  (Tr. 737).  She

also indicated she struggled with depressive symptoms including poor quality mood, loss of

pleasure in activities, irritability, crying spells, excessive guilt, fatigue/loss of energy, low

motivation, and social withdrawal.  *Id.*  Myers also noted symptoms of anxiety, including

"falling asleep due to worry," physical tension, nausea, chest tightness, and shortness of breath.

*Id.*  As to her daily activities, Myers reported that, although she could legally drive, she did so

infrequently because of anxiety issues, and described difficulty completing household chores,

10

cooking, and managing her medication, but noted she could search the internet, watch television, hike and camp, and have regular contact with family.  *Id.*

Dr. Ward conducted a mental status examination and observed that Myers was cooperative, well groomed, appropriately dressed, alert, and fully oriented.  (Tr. 738).  And Myers had normal speech, no loose associations, adequate understanding, no indications of anxiety, normal thought content, and intellectual functioning within normal limits.  *Id.*  Dr. Ward assessed Myers with "Other Trauma and Stressor Related Disorder (Chronic Adjustment)" and "Unspecified Attention Deficit/Hyperactivity Disorder."  (Tr. 739).  Dr. Ward also conducted a functional assessment and concluded that there was no indication that Myers had limitations in her ability to understand, carry out and remember instructions, either one-step or complex.  *Id.* He noted that Myers adequately completed tasks assessing attention but noted her reported history of concentration problems.  *Id.*  Further, he found that Myers did not present with any indications of difficulties related to her ability to work with supervisors, coworkers, and the public or in dealing with the normal pressures of a competitive work setting.  (Tr. 740).

### 3.   State Agency Consultants

#### a.   Physical

On November 30, 2020, Gail Mutchler, M.D., reviewed the medical evidence regarding of Myers's physical limitations.  (Tr. 80-82).  Dr. Mutchler found that Myers could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, could stand and/or walk for 6 hours in an 8-hour workday, and could sit for 6 hours in an 8-hour workday.  (Tr. 80-81).  She also concluded that Myers could frequently climb ramps/stairs, kneel, crouch, and crawl; could occasionally climb ladders, ropes, and scaffolds and stoop, and was unlimited in her balancing ability.  (Tr. 81).  Additionally, Dr. Mutchler concluded that Myers should avoid concentrated exposure to extreme hot and cold; humidity; fumes, odors, dusts, gases, poor ventilation; and

hazards. *Id.* In all other ways, Dr. Mutchler found that Myers had no limitations. *Id.* On April

24, 2021, Leslie Green, M.D., reviewed the medical evidence of Myers's physical limitations

and affirmed Dr. Mutchler's findings. (Tr. 103-105).

### b.      Mental Health

On December 2, 2020, David Dietz, Ph.D., reviewed the medical evidence of Myers's

mental health limitations. (Tr. 82-83). Dr. Dietz concluded that Myers had no limitation in her

understanding and memory and had moderate limitations in the functional domain of sustaining

concentration and persistence, except that she was not significantly limited in her ability to carry

out very short and simple instructions. (Tr. 82). He also found that she was moderately limited

in her ability to interact appropriately with the general public but was not otherwise significantly

limited in her ability to socially interact. (Tr. 83). Moreover, she found that Myers had a

moderate limitation in her ability to respond appropriate to changes in the work setting but was

not otherwise significantly limited. *Id.* On April 26, 2021, Irma Johnston, Psy.D., reviewed the

medical evidence of Myers's mental health limitations and affirmed Dr. Dietz's findings.

(Tr. 105-106).

### D.      Testimonial Evidence

Myers testified at the administrative hearing. (Tr. 51-68). She testified that she lived

with her husband and two sons, and that her husband did most of the chores around the house,

including meal preparation, although she tried to do things but would forget. (Tr. 52-53). Her

husband would also do the driving even though she had a license because she would panic.

(Tr. 53). She would try to do fun things with her sons, such as going to a park, but she would get

panicky once there. (Tr. 53-54). She kept in touch with her mother and grandmother, and her

grandmother, whom she saw daily, lived in the same apartment building as her family. (Tr. 54).

She did not have any hobbies. (Tr. 54-55). She did not watch television or listen to music but

would use her cell phone to read articles.  (Tr. 55).  Myers testified that she last worked about five years earlier, and she had stopped working because the position required her to stand in the sun, and she started having health issues from her then-undiagnosed lupus.  *Id.*  She noted she had previously worked as a quality control and packager for an envelope production company.  (Tr. 55-57).

Myers testified that she believed she could not work because she felt like she was just getting "sicker and sicker" from her lupus.  (Tr. 58).  She did not think the Benlysta shots she was prescribed for her lupus were helping with her symptoms, which included swelling in her ankles, knees, elbows, and severe lower back pain, as well as sinus and throat issues.  (Tr. 58-59).  She noted that her swelling occurred "often," but also depended on the weather.  (Tr. 60).  She tried to elevate her legs and rest to "see if it'll help."  *Id.*  She estimated that she elevated her legs daily for about six hours a day.  (Tr. 60-61).  She explained that when her throat issues flared-up, her throat would basically swell shut, and she would contact her doctor as soon as possible for steroids.  (Tr. 59).  She estimated that she had taken steroids four times over the past year.  *Id.*  She also testified that she took mental health medication that worked great on some days, but "then it has its days where it doesn't work as good."  *Id.*  Myers testified that she also had pinched nerves in her hip and right wrist, for which she wore a brace and struggled to open jars.  (Tr. 61).  She also had arthritis in her shoulders, which caused her "a little bit" of difficulty reaching overhead with her left arm.  (Tr. 62).  She did not have any problems reaching with her right arm or out in front of her.  *Id.*  She also had pain in her lower back when she would do anything physical, stand too long, or bend.  *Id.*  She would start to be uncomfortable standing after "[f]ive or ten minutes, if not more.  Like 20."  *Id.*  Going up and down the stairs would take her breath away and she found it hard to breathe if she did a lot of walking.  (Tr. 63).  She indicated she could sit for much longer.  *Id.*  She could sit in a chair for 20 to 40 minutes before

13

becoming uncomfortable. *Id.* She indicated she took prescription ibuprofen and rested for the pain. (Tr. 64). She also took asthma medication for her breathing, as well as using two inhalers as needed, one for bronchitis and one for albuterol. *Id.* She estimated that she used the albuterol inhaler 10 to 15 times a month, and the bronchitis one, about once a month, but more if she was coughing. *Id.* Dust also impacted her breathing. (Tr. 65).

As to her mental health, Myers testified that she had ADHD, and she has been trying to find a therapist. *Id.* She indicated that her depression affected her "a lot" and she did not want to get out of bed half the time. (Tr. 65-66). She would cry "a lot" and had difficulty sleeping, due to interfering thoughts. (Tr. 66). She would sleep between 3 to 5 hours but would not be able to nap. *Id.* She also had panic attacks which caused her to have to use the restroom. (Tr. 66-67). Being in any spot too long made her panic, as well as being alone or in a crowd. (Tr. 67). She had panic attacks daily and they could task for 5 to 20 minutes. *Id.* Myers also reported difficulty focusing or concentrating on things and remembering what she read. (Tr. 67-68).

## III. Law & Analysis

### A. Standard of Review

The court's review of the Commissioner's final decision denying disability benefits is limited to deciding "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009). Substantial evidence exists "if a reasonable mind might accept the relevant evidence as adequate to support a conclusion," *id.* at 406 (internal quotation marks omitted), even if a preponderance of the evidence might support the opposite conclusion, *O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. 2020). However, the ALJ's decision will not be upheld when the ALJ failed to apply proper legal standards and the legal error prejudiced the claimant. *Rabbers v. Comm'r SSA*, 582 F.3d 647, 654 (6th Cir. 2009). Nor

14

will the court uphold a decision when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp.2d 875, 877 (N.D. Ohio 2011) (internal quotation marks omitted).

### B.     Step Four: Subjective Symptom Complaints

Myers contends that the ALJ erred in evaluating her subjective symptom complaints by failing to adequately explain the basis for her findings.  ECF Doc. 8 at 11-13.  Myers argues that the ALJ relied *solely* on the objective medical evidence in discounting her physical allegations and failed to identify any inconsistency as to her mental health complaints and the evidence of record.  ECF Doc. 8 at 13-14.  The Commissioner disagrees.  ECF Doc. 11 at 6-11.  Myers' reply brief essentially restates the positions argued in her opening brief, while providing specific references to record and further asserting that any post hoc rationalization of the ALJ's decision is improper.  ECF Doc 12 at 1–4.

A claimant's subjective symptom complaints are among the evidence that an ALJ must consider in assessing a claimant's RFC at Step Four of the sequential evaluation process.  *See* 20 C.F.R. §§ 404.1520(e), 416.920(e); *Blankenship v. Bowen*, 874 F.2d 1116, 1123 (6th Cir. 1989) ("Subjective complaints of pain or other symptoms may support a claim of disability.").  Generally, an ALJ must explain whether she finds the claimant's subjective complaints consistent with objective medical evidence and other evidence in the record.  SSR 16-3p, 2016 SSR LEXIS 4 *15 (Oct. 25, 2017); *Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994) (The ALJ must clearly explain her reasons for discounting subjective complaints).  In conducting this analysis, the ALJ may consider several factors, including claimant's efforts to alleviate her symptoms, whether any treatment was effective, and any other factors concerning the claimant's functional limitations and restrictions.  SSR 16-3p, 2016 SSR LEXIS 4 *15-19; 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); *see also Temples v. Comm'r of Soc. Sec.*, 515 F. App'x 460,

462 (6th Cir. 2013) (stating that an ALJ properly considered a claimant's ability to perform day-to-day activities in determining whether his testimony regarding his pain was credible).  The regulations don't require the ALJ to discuss each factor or each piece of evidence, but only to acknowledge the factors and discuss the evidence that supports her decision.  *See Renstrom v. Astrue*, 680 F.3d 1057, 1067 (8th Cir. 2012) ("The ALJ is not required to discuss methodically each [factor], so long as he acknowledged and examined those [factors] before discounting a claimant's subjective complaints." (quotation omitted)); *Simons v. Barnhart*, 114 F. App'x 727, 733 (6th Cir. 2004) ("'[A]n ALJ is not required to discuss all the evidence submitted.'" (quoting *Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000)).

Although the ALJ applied the correct legal standards and reached a decision supported by substantial evidence in finding Myers's *psychological* subjective symptoms complaints were inconsistent with the record evidence, the same cannot be said for the ALJ's explanation as to Myers's subjective *physical* complaints, and, thus, remand is warranted.  42 U.S.C. §§ 405(g), 1383(c)(3); *Blakely*, 581 F.3d at 405.  The ALJ acknowledged her obligations under SSR 16-3p in her review of Myers's complaints.  (Tr. 32).  The ALJ also discussed Myers's physical and mental health complaints and provided a review of the related record evidence.  (*See* Tr. 33-37).  Interspersed within this discussion, the ALJ made clear statements *to the limited effect* that the record evidence did not fully support Myers's subjective symptom complaints.  (*See* Tr. 33, 37).

As to the ALJs explanation of Myers's mental health limitations, the ALJ summarized Myers's complaints and identified specific inconsistencies between Myers's mental health-related claims and the mental status examination notes.  The ALJ cited medical records that showed Myers had adequate energy (despite Myers's complaints of fatigue), no mood problems (despite Myers's complaints of poor mood, irritability, and excessive worry), and normal intellectual functioning (despite Myers's reported difficulty concentrating and paying attention).

16

(*See* Tr. 35).  Additionally, the ALJ cited medical records indicating occasions when Myers had a normal affect, good judgment and insight, and her depression and anxiety symptoms were stable on medication.  *Id.*  It is true that the ALJ did not explicitly connect these clear comparisons to her finding that Myers's subjective mental health complaints were inconsistent with the record evidence.  But, while going the extra mile in explaining their reasoning would have been preferred, such is not a ground for remand when we read the ALJ's decision as a whole and with common sense.  *See Buckhanon ex rel. J.H. v. Astrue*, 368 F. App'x 674, 678-79 (7th Cir. 2020) ("[The court] read[s] the ALJ's decision as a whole and with common sense.").

Moreover, substantial evidence supported the ALJ's finding that Myers's mental health complaints conflicted with the medical evidence.  Such evidence includes: (i) the lack of mental health treatment records, (*see also* Tr. 1022); (ii) Myers's reports that her mental conditions were stable on her medication (*see* Tr. 997, 1018, 1056); (iii) Dr. Ward's evaluation that Myers had no limitations in her mental function, aside from those based on her subjective complaints, (*see* Tr. 739-740); and (iv) treatment notes indicating that Myers had a normal affect and/or good insight and judgment, (*see* Tr. 840, 880, 999, 1019, 1023).  *See Blakely*, 581 F.3d at 406.

As to the ALJ's explanation of Myers's physical limitations, the ALJ's discussion creates a much closer question.  The ALJ provided no specific statements such as, "I find Myers subjective complaints inconsistent based on . . . ."  Nor did she utilize phrasing indicative of a comparison, such as "however" or "despite."  And the Commissioner's brief fares no better in attempting to identify how the ALJ purportedly demonstrated the type of informative comparison required by the regulations.  Indeed, the Commissioner provided a single citation-free sentence, before jumping into to the Commissioner's own substantial-evidence analysis.  *See* ECF Doc. 11 at 7-8.

17

After reviewing the ALJ decision, I find that Myers's contention has merit.  The ALJ did not provide a clear explanation for why she rejected Myers's subjective complaints about her physical health.  And even when I read the ALJ's decision as a whole and with common sense, her discussion of the medical evidence did not permit the me to connect the dots from her finding of inconsistency and Myers's statements and the medical evidence.  In fact, reviewing the ALJ decision suggests the opposite conclusion, because the ALJ noted the ongoing *consistency* of Myers's complaints, identified various functional limitations supported by the record evidence, and found greater limitations than those proposed by some medical opinions.  (*See* Tr. 32-37).  The decision is a close one only because Myers may be one of those Social Security claimants whose history of medical treatment is neither lengthy nor exhaustive.  When those claims get evaluated, it is more difficult for an administrative law judge to cite specifically conflicting evidence – because there is simply not an abundance of evidence to cite.  However, we may not invent a statement of reasoning that the ALJ did not supply in order to uphold the Commissioner's final decision.  And the ALJ's decision in this matter no doubt left Myers mystified about why the ALJ discredited her testimony and her consistent statements to her medical professionals about her pain and physical problems arising from her lupus erythematosus.  Therefore, I conclude that, at a minimum, the ALJ failed to build a logical bridge between her findings and the evidence.  Remand is warranted.  *See Fleischer*, 774 F. Supp.2d at 877; *Blakely*, 581 F.3d at 405.

## IV.     Recommendation

Because the ALJ failed to apply proper legal standards in how she explained her finding that Myers's subjective symptom complaints regarding her physical health were inconsistent with the record evidence, I recommend that the Commissioner's final decision denying Myers's

applications for DIB and SSI be vacated and that Myers's case be remanded for further

consideration.

Dated: November 3, 2023

Thomas M. Parker
United States Magistrate Judge

**Objections, Review, and Appeal**

Within 14 days after being served with a copy of this report and recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the magistrate judge.  Rule 72(b)(2), Federal Rules of Civil Procedure; *see also* 28 U.S.C. § 636(b)(1); Local Rule 72.3(b).  Properly asserted objections shall be reviewed de novo by the assigned district judge.

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendation.  *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019).  Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991).  Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 U.S. Dist. LEXIS 100383, *6 (W.D. Ky. June 15, 2018) (quoting *Howard*).  The failure to assert specific objections may in rare cases be excused in the interest of justice.  *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).